Alan J. Leiman (OSB No. 98074)
alan@leimanlaw.com
LEIMAN LAW, PC
P.O. Box 5383
Eugene, Oregon 97405
Telephone: 541.345.2376

Michael J. Malatesta (to apply *PHV*)
mike@malatestalaw.com
MALATESTA LAW OFFICES, LLC
5310 N. Harlem Avenue, Suite 203
Chicago, Illinois 60656
Telephone: 312.445.0514

*Counsel for Plaintiffs and the Class*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF OREGON
## EUGENE DIVISION

| | |
|---|---|
| BRUNO HANNEY and PAUL TAYLOR, individually and on behalf of all others similarly situated, | Case No. 6:21-cv-1199 |
| Plaintiffs, | **CLASS ACTION ALLEGATION COMPLAINT** |
| v. | Breach of Contract |
| | Unlawful Trade Practices Act |
| EPIC AIRCRAFT, LLC, a Delaware limited liability company, | **DEMAND FOR JURY TRIAL** |
| Defendant. | |

Plaintiffs Bruno Hanney and Paul Taylor ("Plaintiffs"), individually and on behalf of all others similarly situated, by and through their undersigned counsel, bring this Class Action Complaint against Defendant Epic Aircraft, LLC ("Epic" or "Defendant"), and complain and allege upon personal knowledge as to themselves

and their own acts and experiences and, as to all other matters, upon information and belief, including investigation conducted by counsel.

## NATURE OF THE ACTION

1.    This is a breach of contract and consumer fraud class action brought individually by Plaintiffs and on behalf of all persons or entities in the below-defined class ("Class") who entered into E1000 aircraft reservation agreements with Epic.

2.    In 2014, Epic announced that it planned to design, develop and manufacture a single-engine, six-seat turboprop E1000 aircraft and that it hoped to achieve Federal Aviation Administration ("FAA") certification in 2015.

3.    In order to assess market demand and to secure orders, Epic began taking reservations from customers to purchase an E1000 at a specified price by entering into an Epic E1000 aircraft customer reservation agreement.

4.    Plaintiffs and other Class members decided to reserve the right to purchase an E1000 airplane and entered into customer reservation agreements with Epic.

5.    Plaintiffs and other Class members performed all obligations provided for in the contract between the parties. Plaintiffs and Class members executed an Epic E1000 aircraft customer reservation agreement and submitted payment to Epic as a deposit.

6.    Shortly after receiving Plaintiffs' and Class members' E1000 aircraft customer reservation agreements and deposits, Epic provided Plaintiffs and Class

members with an E1000 aircraft reservation confirmation that secured a particular production order position and locked in the aircraft base price of $2.75 million.

7. After several years of development efforts, in November 2019 Epic announced that the FAA had granted type certification for its E1000 aircraft design. At that time, Epic also disclosed that it planned to begin initial E1000 aircraft customer order deliveries in late 2019.

8. In July 2020, Epic announced that it had received a FAA production certificate for its E1000 aircraft, which allowed Epic to accelerate aircraft customer order deliveries by enabling it to manufacture, flight test and issue airworthiness certificates with reduced FAA presence. At that time, Epic stated that it had already completed three aircraft customer order deliveries in 2020 and had developed plans accelerate production schedules.

9. Unbeknownst to Plaintiffs and other Class members, who relied upon Epic's representations that it was actively working to manufacture E1000 aircraft in an effort to fulfill and deliver customer orders, Epic abolished its plan to sell E1000 aircraft.

10. Less than a month after receiving a FAA production certificate for its E1000 aircraft, in late August 2020 Epic, suddenly and without advance notice, sent a letter to all customers who had outstanding E1000 aircraft reservation agreements stating that the E1000 aircraft was no longer available for sale.

11. In its August 2020 letter, Epic informed customers that it planned to make limited modifications to the E1000 aircraft and introduce a new E1000 model

aircraft, known as the E1000 GX, which had a retail base price of $3.85 million.

12.    Epic's E1000 GX retail base price of $3.85 million was over $1 million higher than Plaintiffs' and other Class members' contractual base purchase price of $2.75 million for an Epic E1000 aircraft.

13.    Despite having numerous outstanding aircraft reservation contracts with customers for the manufacture and purchase of Epic E1000 aircraft, Epic refused to manufacture and sell Plaintiffs and Class members' any E1000 aircraft.

14.    Epic manufactured, advertised, marketed and sold its E1000 aircraft throughout a large majority of the United States, including in the State of Oregon and in this District.

15.    As a result of Epic's breach of contract and deceptive conduct, Plaintiffs and the Class seek actual and punitive damages, injunctive and declaratory relief, interest, costs, and reasonable attorneys' fees.

## PARTIES

16.    During the Class period, Class members in Oregon and throughout the United States executed Epic E1000 aircraft customer reservation agreements. Plaintiffs and Class members suffered an injury in fact caused by the breach of contract and the fraudulent, unfair, deceptive and misleading practices set forth in this Class Action Complaint.

17.    Plaintiff Bruno Hanney is a citizen of the State of Wisconsin. In July 2014, Mr. Hanney executed two Epic E1000 aircraft reservation agreements and

submitted payments to Epic as deposits to secure the right to reserve and purchase two Epic E1000 aircraft.

18.     Plaintiff Paul Taylor is a citizen of the State of Virginia. In July 2014, Mr. Taylor executed an Epic E1000 aircraft reservation agreement and submitted payment to Epic as a deposit to secure the right to reserve and purchase an Epic E1000 aircraft.

19.     Defendant Epic Aircraft, LLC is a privately-held Delaware limited liability company with its principal place of business located at 22590 Nelson Road, Bend, Oregon. Epic is a general aviation aircraft company that manufactures, markets and sells private aircraft throughout the United States.

## JURISDICTION AND VENUE

20.     This Court has subject matter jurisdiction over this class action pursuant to 28 U.S.C. § 1332(d). The matter in controversy, exclusive of interest and costs, exceeds the sum or value of $5,000,000 and is a class action in which some members of the Class are citizens of States other than the State in which Epic is incorporated and has its principal place of business.

21.     Diversity jurisdiction exists because Plaintiffs are citizens of Wisconsin and Virginia and Epic is a citizen of Delaware and Oregon.

22.     This Court has personal jurisdiction over Epic because it maintains its corporate headquarters in this District. Additionally, Epic conducts substantial business in Oregon. Epic has marketed, manufactured and sold E1000 aircraft in Oregon. Epic has sufficient minimum contacts with this State and sufficiently

avails itself to the markets of this State through its sales and marketing within this State to render the exercise of jurisdiction by this Court permissible.

23.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1), (b)(2) and (c) because Epic maintains its corporate headquarters in this District and a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District. Venue is also proper under 18 U.S.C. § 1965(a) because Epic is headquartered in and transacts substantial business in this District.

24.    Further, venue is proper in this District because the E1000 aircraft customer reservation agreement governing the relationship between Plaintiffs and Class members on one hand, and Epic on the other, states that "[e]ach of the Parties consents to the exclusive jurisdiction and venue of the Courts of Deschutes County, Oregon[,]" which is located in this District.

## CHOICE OF LAW PROVISIONS

25.    The E1000 aircraft customer reservation agreements governing the relationship between Plaintiffs and Class members on one hand, and Epic on the other, expressly calls for the application of Oregon law to this dispute. The agreements explicitly state, "[t]his Agreement and all acts and transaction pursuant hereto shall be construed, interpreted and enforced in accordance with the laws of the State of Oregon, without regards to principles of conflicts of law."

## FACTUAL ALLEGATIONS

### *Epic Starts Selling Turboprop Aircraft Kits*

26.    In 2004, Epic introduced and began selling its LT model, a single-engine, six-seat turboprop aircraft.

27.    In order to avoid the time and expense of obtaining FAA certification for its LT model, Epic sold its LT aircraft as a kit.

28.    Upon purchasing an Epic LT aircraft kit, buyers typically spent several weeks at Epic's facility to start building the plane in compliance with the 51% percent owner-built rules. Once past that hurdle, customers then were able to contract with Epic for the company to build the rest of the aircraft and to add on various options.

***Epic Runs into Financial Troubles and Files for Bankruptcy***

29.    In 2009, several lawsuits were filed against Epic that alleged serious misconduct by the company's senior-level principals. In a sworn statement, Epic's former Chief Financial Officer David Clark stated that Epic owed its customer builders an estimated $14 million for parts and that the company did not have sufficient funds to pay those debts. Clark's sworn statement also alleged many financial irregularities and that the company's financial reports and practices did not comply with generally accepted accounting practices.

30.    In September 2009, Epic's former Chief Executive Officer Rick Schrameck was removed by the board of directors from any managerial or supervisory capacity, and the company filed for Chapter 11 bankruptcy seeking to reorganize and find new investors. The company was subsequently sold at auction.

31.    In 2015, Schrameck was criminally charged by federal authorities with eight counts of wire fraud, four counts of mail fraud and six counts of money laundering. Criminal charges against Schrameck alleged that he sold Epic aircraft

kits to customers for millions of dollars but used the money for other projects as well as to support his lavish lifestyle. In 2018, Schrameck pled guilty to one count of wire fraud and was sentenced to prison.

***Epic Announces Plans to Seek FAA Certification for Its Turboprop Aircraft***

32.     In 2013, Epic stopped taking orders for LT aircraft kits, and instead focused its efforts on achieving FAA certification for a variant of the LT model, known as the E1000 model aircraft.

33.     In 2014, Epic announced that it planned to manufacture its E1000 single-engine, six-seat turboprop aircraft and that it hoped to achieve FAA certification in 2015.

34.     Epic's E1000 model aircraft is largely based upon its predecessor, the Epic LT model aircraft kit. Epic's management confirmed in news reports that the E1000 is simply a production version of the LT model aircraft, and that there would be minimal changes to the airplane.

35.     The first major milestone in the FAA aircraft certification process is achieving type certification, which confirms that the aircraft design complies with all FAA airworthiness regulations.

36.     In February 2014, Epic issued a press release stating that its E1000 model aircraft was on schedule to achieve FAA type certification in 2015 and that initial E1000 aircraft customer deliveries were targeted for the second half of 2015.

***Epic Starts Accepting Customer Reservations for Its E1000 Model Aircraft***

37.     In order to assess market demand and to secure orders, in 2014 Epic began taking reservations from customers for the right to reserve and purchase an E1000 aircraft at a specified price by executing an Epic E1000 aircraft reservation agreement.

38.     Epic's E1000 aircraft customer reservation agreement stated that "Epic intends to obtain certification of the Aircraft for sale in the United States and to begin sales of the Aircraft in 2015 or 2016[.]"

39.     As consideration for the right to reserve and purchase an E1000 aircraft once Epic received FAA certification, Epic's E1000 aircraft reservation agreement required customers to submit payment of $27,500, or 1% of the $2.75 million base purchase price, to Epic as a deposit that would be credited towards the purchase of an E1000 aircraft.

40.     Another benefit of executing an Epic 1000 aircraft reservation agreement and submitting the required deposit was that customers received a number representing the order in which a customer's E1000 aircraft would be produced.

41.     Epic's E1000 aircraft customer reservation agreement expressly stated "Epic represents that when and if the Aircraft is certified, Aircraft will be sold to customers in the order in which Epic receives fully executed Agreements."

42.     With respect to termination of the parties' contract, Epic's E1000 aircraft customer reservation agreement stated that "Epic shall be entitled to

terminate this Agreement and refund the Deposit only if Epic terminates its program to certify and/or produce the Aircraft or if the Parties do not enter into a final Purchase Agreement after the Aircraft is certified."

43.     In July 2014, Plaintiff Hanney and another individual executed two Epic E1000 aircraft reservation agreements and jointly submitted two deposits of $27,500 to Epic, which was equivalent to 1% of the contractually agreed-upon base purchase price of $2.75 million.

44.     Also in July 2014, Plaintiff Taylor executed an Epic E1000 aircraft reservation agreement and submitted a deposit of $27,500 to Epic, which was equivalent to 1% of the contractually agreed-upon base purchase price of $2.75 million.

45.     Shortly after receiving Plaintiffs' executed aircraft reservation agreements and deposits for Epic E1000 aircraft, Epic provided Plaintiffs with E1000 reservation confirmations that secured Plaintiffs' production order positions and locked in the aircraft base price of $2.75 million.

*Epic Repeatedly Assures Customers of Its Intent and Plans to Achieve FAA Type and Production Certification for Its E1000 Model Aircraft*

46.     Epic's E1000 developmental and certification efforts took longer than expected and were significantly more expensive than initially anticipated.

47.     Epic initially planned and advertised to customers that its E1000 aircraft would be available for sale in 2015.

48.     In July 2015, Epic announced that the production schedule for its E1000 aircraft had been extended into 2016. Epic's Chief Executive Officer, Doug

King, assured customers that "[w]e are solidly on track for certification by the first half of 2016, with initial deliveries and production ramp to follow[.]"[1] King further exclaimed that Epic's E1000 aircraft will deliver "jet-class performance at turboprop prices."[2]

49.     In December 2015, Epic conducted its first flight test for the E1000 model aircraft at the Bend Municipal Airport in Bend, Oregon. The flight test lasted for 20 minutes and focused on assessing general handling qualities and operational performance systems.

50.     Epic's second and final test flight for the E1000 model aircraft was expected to occur in the spring of 2016, which would assess interior and cabin functionality including fuel, hydraulic, avionics, navigational and environmental systems.

51.     Epic's December 2015 newsletter reassured customers that its E1000 FAA type certification remained on schedule for 2016 and that initial customer order deliveries would be made shortly after obtaining certification.

52.     The newsletter also publicly touted that when Epic launched its FAA certification program several years ago, it had a staff of only 35 employees. As of December 2015, the company represented that it employed over 200 full-time professionals and owned two production facilities with over 300,000 square feet specifically designed for the production of E1000 aircraft.

---

[1]     *Epic E1000 Certification Expected Next Year*, FLYING, July 20, 2015 https://www.flyingmag.com/aircraft/turboprops/epic-e1000-certification-expected-next-year/.
[2] *Id.*

53.     Additionally, Epic publicly stated that it expected to achieve FAA production certification in late 2016, with production ramp up to begin immediately thereafter. Epic also informed customers that it planned to build 50 Epic E1000 aircraft per year, with the potential to expand production volume based on market demand.

54.     In May 2016, Epic's Director of Sales, Mike Schrader, told news sources that Epic had over 60 orders for its E1000 model aircraft and the company would start customer deliveries as soon as FAA approval was obtained.[3]

55.     In July 2016, Epic launched its Odyssey World Tour, an around-the-world journey where a fleet of six Epic aircraft led by a team of internationally experienced pilots traveled to nine countries and 20 cities in 21 days, covering over 15,000 nautical miles in 50 flight hours. Epic publicly advertised that its aircraft had no maintenance issues throughout the duration of the tour around the globe.

56.     In early 2017, Epic released its Winter 2017 newsletter that provided an FAA certification and production update on its E1000 model aircraft. First, Epic's Chief Executive Officer, Doug King, stated that FAA type certification for the E1000 model aircraft was "very achievable" in the fourth quarter of 2017. King explained to customers that Epic had completed nearly all structural testing and was awaiting FAA final approval on the aircraft's wings and fuselage.

57.     Additionally, with respect to production, King flaunted that Epic had implemented a state-of-the-art computer integrated production planning and

---

[3] *Epic Prepares Production-Conforming E1000 for First Flight*, FLIGHTGLOBAL, May 4, 2016, https://web.archive.org/web/20160506052236/https://www.flightglobal.com/news/articles/epic-prepares-production-conforming-e1000-for-first-424892/.

control system, recruited a top software designer to customize the system to exact specifications, doubled the size of the company's composite parts production area and invested in additional tooling and equipment. King further stated that Epic was actively collaborating with the FAA on a pilot program with an objective of achieving both type and production certificates, which would allow Epic to ramp up production more quickly to the company's planned production of 50 E1000 aircraft per year.

58.    In January 2018, Epic conducted its second conforming flight test on its E1000 model aircraft. At that time, Epic represented that FAA type certification on its E1000 aircraft, which was previously expected at the end of 2017, was now planned for the summer of 2018. Epic's Director of Sales further commented that the company had received over 80 customer orders for its E1000 aircraft.[4]

59.    In July 2018, Epic announced that it had successfully completed the structural testing phase of its E1000 type certification program. In a press release, Epic's Chief Executive Officer stated that Epic anticipated receiving FAA type inspection authorization later that month. Moreover, Epic's Chief Executive Officer assured customers that the company was on track to achieve FAA type certification in connection with its E1000 aircraft by the end of 2018 and that the first E1000 customer order deliveries were expected to be completed in early 2019.[5]

---

[4] *Epic Aircraft Flies Second Conforming E1000 Prototype*, AIN ONLINE, Jan. 25, 2018, https://www.ainonline.com/aviation-news/business-aviation/2018-01-25/epic-aircraft-flies-second-conforming-e1000-prototype.
[5] *Epic Aircraft Completes E1000 Structural Testing*, EPIC AIRCRAFT, July 25, 2018, http://epicaircraft.com/wp-content/uploads/2018/07/EPIC_PR_25Jul2018_FINAL.pdf.

60.     Importantly, Epic's July 2018 press release informed customers that the company had "doubled [its] composite fabrication capacity and refined workflows to support planned production volumes of 50 aircraft per year" as well as was "currently running two production work shifts, with plans to eventually support around-the-clock-production capacity."[6]

### *Epic Achieves FAA Type and Production Certification for the E1000 Aircraft*

61.     FAA type inspection authorization is a precursor to obtaining FAA type certification, and it confirms that an aircraft's design, structural and flight test results are in compliance with FAA regulations.

62.     In July 2019, Epic announced that it was approved for type inspection authorization by the FAA, which would allow FAA pilots to conduct the final phases of conformity inspections and flight testing.

63.     In a press release, Epic's Chief Executive Officer informed customers that Epic was on schedule to achieve FAA type certification for its E1000 aircraft by the end of 2019.[7] Similar to its July 2018 press release, Epic's July 2019 press release stated that the company: (i) "had doubled its composite fabrication capacity"; (ii) "invested heavily in tooling and equipment"; (iii) "refined workflows to accelerate E1000 production ramp"; and (iv) was "currently running two production shifts, with plans to expand operations" in the fall of 2019.[8]

---

[6] *Id.*
[7] *Epic Aircraft Approved for Type Inspection Authorization*, EPIC AIRCRAFT, July 22, 2019, https://epicaircraft.com/wp-content/uploads/2019/07/EPIC_PR_22Jul2019_FINAL.pdf
[8] *Id.*

64.     After many years of assuring customers that Epic was seeking FAA certification in preparation of manufacturing and selling the E1000 airplane to aircraft customer reservation holders, in November 2019 Epic announced that the FAA granted type certification for its E1000 model aircraft.

65.     In a November 2019 press release, Epic disclosed that it had over 80 E1000 aircraft customer reservations, the first seven E1000 aircraft customer orders were in various stages of fabrication, bonding and assembly, and initial customer deliveries were scheduled to start at the end of 2019. Once again, Epic assured customers that: (i) it had doubled its composite fabrication capacity; (ii) invested heavily in tooling, equipment and curing ovens; (iii) refined workflows to accelerate E1000 production ramp; (iv) the company was currently running two production shifts with plans to further expand operations; and (iv) FAA production certification was targeted for the first quarter of 2020.[9]

66.     Once the FAA certifies a new aircraft design and grants type certification, the second major milestone to FAA certification is achieving production certification.

67.     Production certification is achieved when the FAA verifies that all facilities, manufacturing processes and quality protocols will support production of the aircraft design to the same conforming standards every time.

68.     Until production certification is finalized and obtained, an FAA inspector must personally inspect each aircraft that comes off of the production line,

---

[9] *Epic Aircraft Achieves FAA Type Certification*, EPIC AIRCRAFT, Nov. 6, 2019, https://epicaircraft.com/wp-content/uploads/2019/11/epic-aircraft-achieves-faa-type-certification.pdf.

which significantly limits the ability to ramp up aircraft production volume.

69.   In June 2020, an aviation news source reported that Epic had delivered two certified E1000 aircraft to customers and planned to fill its customer reservation orders as soon as possible.[10]

70.   On July 23, 2020, Epic announced that it obtained FAA production certification for its E1000 aircraft, which would allow the company to accelerate aircraft deliveries by enabling it to manufacture, flight test and issue airworthiness certificates with reduced FAA presence.

71.   In a press release, Epic confirmed that it had completed three E1000 aircraft customer deliveries in 2020 and planned to further accelerate production schedules to fulfill customer orders.[11]

72.   At that time, Epic claimed that the company was ready several months earlier to complete an FAA production audit, a prerequisite to obtaining FAA production certification, when the COVID-19 pandemic disrupted plans. Epic also told customers that FAA-mandated travel limitations restricted onsite visits to Epic's facilities, which are essential to the production certification approval process.[12]

73.   Finally, after approximately seven years of efforts to obtain FAA type certification and production certification, Epic had everything it needed to move forward with the production and sale of E1000 aircraft for over 80 customer

---

[10] *Epic Delivers First Two Certified E1000s*, AVWEB, June 1, 2020, https://www.avweb.com/aviation-news/epic-delivers-first-two-certified-e1000s/.
[11] *Epic Aircraft Receives FAA Production Certificate*, EPIC AIRCRAFT, July 23, 2020, http://epicaircraft.com/wp-content/uploads/2020/07/Epic_ProductionCert_PR_FINAL.pdf.
[12] *Id.*

reservations and orders, including with Plaintiffs and other Class members.

*Epic's E1000 Aircraft Pricing Increases Over Time*

74. Epic's Chief Executive Officer estimated that FAA certification for its E1000 model aircraft would take approximately three years and cost $20 million. However, the FAA approval process lasted almost seven years and cost $200 million.

75. Over time, as Epic's efforts to obtain FAA type and production certification took longer than anticipated, Epic gradually increased the retail price of its E1000 model aircraft to the general public.

76. In 2013 and 2014, Epic first priced its E1000 model aircraft at $2.75 million, which is the price that was offered to Plaintiffs and other Class members' who executed Epic E1000 aircraft customer reservation agreements.

77. In 2015 and 2016, aviation news sources reported that Epic had set a purchase price of $2.95 million for its E1000 model aircraft.

78. In 2019, after obtaining FAA type certification, aviation news sources reported that Epic's E1000 model aircraft had a retail price tag of $3.25 million.

79. When Epic received FAA production certification for its E1000 model aircraft in July 2020, the company reported that it had received over 80 reservations and customer orders. Consequently, Epic knew that if it could increase the base purchase price of its E1000 aircraft, it stood to gain a significant amount of additional revenue.

80.     Moreover, one of Epic E1000's primary competitor airplanes was the Daher TBM 930 model aircraft. Daher's TBM 930 model aircraft debuted in 2016 as a fully-certified, single-engine turboprop aircraft.

81.     Both the Epic E1000 and the TBM 930 model aircraft have similar features such as six-person seating, Pratt & Whitney engines, Hartzell propellers and maximum cruise speeds and ranges. While the Epic E1000 aircraft was priced at $2.95 million in 2016, the TBM 930 aircraft had a retail price of $4.099 million.

82.     Considering that Epic's primary competitor airplane retailed for over $1 million higher than the E1000 model aircraft, Epic knew that it could make substantially more revenue in the marketplace if it devised a way to be released from its contractual obligations set forth in Epic E1000 aircraft customer reservation agreements.

***Epic Suddenly Tells Customers That the E1000 Is No Longer Available***

83.     Less than a month after receiving FAA production certification for its E1000 model aircraft, Epic sent a letter in late August 2020 to E1000 customer reservation holders, including Plaintiffs and Class members, stating that the E1000 aircraft was no longer available for sale.

84.     In its letter to customers, Epic announced its plans to introduce a new model aircraft called the E1000 GX, which had a retail base price of $3.85 million.

85.     Epic's E1000 GX base purchase price of $3.85 million was $1.1 million higher than Plaintiffs' and other Class members' contractual base purchase price of $2.75 million for an Epic E1000 aircraft.

86.     Epic's letter advised customers that the E1000 GX model aircraft was equipped with a Garmin GFC 700 digital autopilot system and a Hartzell five-blade propeller. Further, Epic stated that it was currently working on FAA certification, which was expected to be obtained during the first half of 2021.

87.     Contrary to Epic's representations, the E1000 GX model aircraft was not a new aircraft. As shown in the chart below, the E1000 model aircraft's primary features and equipment are identical to the E1000 GX model aircraft except for minor differences in the autopilot system and the propeller:

| Aircraft Features | Epic E1000 | Epic E1000 GX |
|---|---|---|
| Engine | Pratt & Whitney PT6A-67A | Pratt & Whitney PT6A-67A |
| Construction | Carbon Fiber | Carbon Fiber |
| Seats | 6 Adults | 6 Adults |
| Avionics | Garmin G1000 NXi 3-Screen Avionics Suite | Garmin G1000 NXi 3-Screen Avionics Suite |
| Autopilot System | Genesys S-TEC 2100 Autopilot System | Garmin GFC 700 Autopilot System |
| Propeller | Hartzell 4-Blade Propeller | Hartzell 5-Blade Propeller |

88.     Prior to Epic's August 2020 letter, Epic never informed customers of its intent modify the E1000 aircraft or to stop selling the E1000 model aircraft. That is because Epic never intended to honor customer reservation agreements for the right to reserve and purchase an E1000 aircraft.

89.     As one aviation news source pointed out, "Epic originally installed the STEC 2100 autopilot to pair with the G1000 (and later the G1000 NXi). Epic decided to stick with the STEC 2100 through [FAA] certification for the plane since that autopilot was on all of the E1000s paperwork going through all the levels of

FAA approval."[13]

90.     In September 2020, Epic sent another letter to E1000 aircraft customer reservation holders, including Plaintiffs and Class members, stating that "Epic has terminated its program to produce the E1000 and is exercising its right to terminate our reservation agreement."

91.     In its letter, Epic claimed that customers' E1000 aircraft reservation agreements do not obligate Epic to offer to sell anyone an E1000 aircraft and that after the E1000 aircraft was certified, a customer and Epic may enter into a purchase agreement upon mutually agreeable terms.

92.     Epic's unlawful conduct is in breach of Plaintiffs' and Class members' E1000 aircraft customer reservation agreements, which state that "Epic shall be entitled to terminate this Agreement and refund the Deposit only if Epic terminates its program to certify and/or produce the Aircraft or if the Parties do not enter into a final Purchase Agreement after the Aircraft is certified."

93.     Plaintiffs and other Class members are ready, willing and able to enter into purchase agreements for the E1000 aircraft at the contractually agreed-upon price provided in E1000 aircraft customer reservation agreements.

94.     After reneging on customers' E1000 aircraft reservation agreements, Epic's September 2020 letter offered to sell Plaintiffs and other Class members an E1000 GX model aircraft. The letter stated that the price of an E1000 GX aircraft would start at the base price previously offered, incorporate an annual inflation

_____

[13] *Epic E1000 Gets the GFC 700*, TEXAS TOP AVIATION, Dec. 29, 2020, http://txtopaviation.com/epic-e1000-gets-the-gfc-700/.

adjustment of 3% compounded annually and include a $635,000 "model upgrade charge."

95.    Epic's E1000 GX aircraft customer reservation agreement and the E1000 GX customer purchase agreement both confirm that Epic did not cease manufacturing the E1000 model aircraft; it merely made a couple of changes to the aircraft in order to generate millions of dollars in additional revenue.

96.    Epic's E1000 GX aircraft customer reservation agreement, which was attached to Epic's September 2020 letter, stated that "the Epic E1000 is a certified single-engine, turboprop aircraft" and that "Epic is currently upgrading the E1000 to create the E1000GX[.]"

97.    Epic's decision to "upgrade" the E1000 model aircraft to the E1000 GX shows that it has FAA authority as well as the ability to manufacture and sell the E1000 aircraft to customers as set forth in Plaintiffs' and Class members' E1000 aircraft customer reservation agreements.

98.    Similarly, Epic's E1000 GX purchase agreement also shows that Epic continues to manufacture the E1000 aircraft with slight modifications. The pricing section of Plaintiffs' E1000 GX purchase agreement contains three components: (i) a base purchase price of $2.75 million (the price the parties previously agreed to in their Epic E1000 aircraft customer reservation agreement); (ii) model upgrades to the E1000 GX of $635,000 (without any description of model upgrades provided); and (iii) options selected by buyer of $0.

99. Further, the E1000 GX contract pricing is based upon a base escalation year of 2014, which is the year in which Plaintiffs executed three different E1000 aircraft customer reservation agreements. Based on the terms of Epic's E1000 GX purchase agreement, Plaintiffs and other Class members would be forced to pay an annual inflation adjustment at a rate that is the greater of either the WPU1425 annual producer price index or 3% per year compounded annually.

100. In October 2020, Epic released a product brochure featuring the Epic E1000 GX model aircraft. In its brochure, Epic expressly advertised that it was "Delivering a More Epic E1000" by incorporating the Garmin GFC 700 automated autopilot system and a Hartzell five-blade propeller. In fact, the Garmin automated pilot system and Hartzell propeller were the only features addressed in Epic's E1000 GX aircraft brochure.

101. Photographs found on Epic's website of its E1000 GX model aircraft show that the airplane's control wheel is clearly labeled as the Epic E1000 (*see* Figure 1 below).



Figure 1.[14]

102.    Epic's sudden decision to purportedly discontinue the E1000 model aircraft is a pretextual reason for refusing to honor E1000 customer reservation agreements.

103.    In reality, Epic wanted to recover the monies that it had expended over several years while seeking to obtain FAA type certification and production certification.

104.    Epic's Chief Executive Officer estimated that FAA certification for its E1000 model aircraft would take approximately three years and cost $20 million; however, the FAA approval process actually lasted almost seven years and cost $200 million.

---

[14] *Introducing the Epic E1000 GX*, EPIC AIRCRAFT, https://epicaircraft.com/epic-certified-e1000/ (last visited Aug. 13, 2021).

105. Plaintiffs and other Class members executed E1000 aircraft customer reservation agreements and submitted deposits to Epic because they believed, based upon Epic's representations, that it was designing and developing a single-engine, turboprop aircraft pursuant to and in accordance with FAA regulations that would be manufactured and sold in the United States.

106. Epic expressly represented to E1000 aircraft customer reservation holders that when the aircraft was certified, the airplane would be sold to customers in the order in which Epic received executed reservation and purchase agreements.

107. Plaintiffs, Class members, and a reasonable consumer would consider these representations when making the decision to enter into E1000 aircraft customer reservation agreements and submitting the required monetary deposit to Epic. Further, Plaintiffs, Class members, and a reasonable consumer would also consider these representations when deciding to forgo purchasing another plane while Epic actively worked towards obtaining FAA certification.

108. As described above, Epic spent years to obtain FAA type certification and production certification for its E1000 aircraft. Through these processes and approvals, Epic unquestionably had the authority and capabilities to manufacture and sell its E1000 aircraft to Plaintiffs and other Class members who held E1000 aircraft customer reservation agreements.

109. During that time in which Epic sought FAA certification for its E1000 model aircraft, Epic repeatedly assured customers that once FAA certification was obtained, it would immediately start manufacturing, selling and delivering E1000

aircraft to customers who held Epic E1000 aircraft reservation agreements.

110.    For instance, when announcing that it had received FAA type certification for its E1000 model aircraft in November 2019, Epic classified FAA approval as "remarkable accomplishment," informed the public that the company had received over 80 E1000 aircraft reservations, and represented that it was significantly expanding fabrication capacity to accelerate E1000 production capabilities.

111.    Additionally, after obtaining a FAA production certificate for its E1000 model aircraft in July 2020, Epic's Chief Executive Officer stated that: (i) the company had achieved a "tremendous milestone"; (ii) FAA approval "validate[d] the extraordinary efforts of our team and the extensive investments we have made in our world-class manufacturing and quality control systems"; and (iii) Epic had already completed three E1000 aircraft customer deliveries in 2020 and planned to further accelerate production schedules for other customer orders.

112.    Epic was fully aware that customers had entered into E1000 aircraft customer reservation agreements and were waiting for Epic to obtain FAA certification in preparation of manufacturing, selling and delivering E1000 aircraft.

113.    Despite having numerous outstanding aircraft reservation contracts with customers for the right to purchase an Epic E1000 aircraft, Epic has wrongfully refused to manufacture and sell any E1000 aircraft to Plaintiffs and other members of the Class.

114.   Prior to August 2020, Epic never informed customers of its plan to modify the E1000 model aircraft or that any update to the aircraft would purportedly provide Epic with sole discretion to terminate E1000 aircraft customer reservation agreements.

115.   Epic purposely omitted these material facts when contracting with E1000 aircraft customers and when making public representations regarding the progress of obtaining FAA certification of its E1000 aircraft, to the detriment of Plaintiffs and other Class members.

116.   Plaintiff and Class members had a reasonable expectation that when executing Epic E1000 aircraft customer reservation agreements and submitting deposits to Epic, they were receiving the right to reserve and purchase an E1000 aircraft once FAA certification was obtained.

117.   Plaintiff and other members of the Class would not have executed E1000 aircraft customer reservation agreements and submitted deposits to Epic if they had known that Epic could unilaterally decide to change the aircraft in any manner and terminate existing aircraft customer reservation agreements.

118.   Plaintiff and Class members were in fact misled by Epic's representations regarding the true nature of its intention to design, manufacture and sell the E1000 model aircraft.

119.   Plaintiffs and Class members have suffered ascertainable losses as a result of Epic's breach of contract and material misrepresentations and omissions. Plaintiffs and Class members contracted for the right to reserve and purchase an

E1000 model aircraft, waited several years as Epic repeatedly assured the public of its intent to manufacture and sell the E1000 model aircraft, and are now being forced to purchase an E1000 GX model aircraft at a significantly higher price or take nothing at all.

120.    Epic's breach of contract and violations of Oregon's consumer protection laws have directly and proximately caused Plaintiffs and Class members to be injured in their business or property because they paid for the right to reserve and purchase an E1000 aircraft at a set price, but Epic has sought to terminate existing aircraft customer reservation agreements in favor of selling a far more expensive, nearly-identical aircraft.

## CLASS ACTION ALLEGATIONS

121.    Plaintiffs bring this class action lawsuit on behalf of themselves and a Class of similarly situated persons, pursuant to Rule 23(b)(2) and (b)(3) of the Federal Rules of Civil Procedure.

122.    Plaintiffs seeks certification of the following Class:

> **National Class:** All persons and entities in the United States who executed an E1000 aircraft customer reservation agreement and submitted a deposit to Epic for the right to reserve and purchase an E1000 model aircraft.

Excluded from the Class are Epic and its affiliates, parents, subsidiaries, employees, officers, agents, and directors. Also excluded are any judicial officers presiding over this matter and the members of their immediate families and judicial staff.

123. Certification of Plaintiffs' claims for class-wide treatment is appropriate because Plaintiffs can prove the elements of their claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

124. **Numerosity – Federal Rule of Civil Procedure 23(a)(1).** The members of the Class are so numerous that their individual joinder herein is impracticable. On information and belief, there are over 80 Class members. The precise number or identification of Class members are presently unknown to Plaintiffs, but may be ascertained from Epic's books and records. Class members may be notified of the pendency of this action by mail, email, Internet postings, and/or publication.

125. **Commonality and Predominance – Federal Rule of Civil Procedure 23(a)(2) and 23(b)(3).** Common questions of law and fact exist as to all Class members, which predominate over any questions affecting only individual members of the Class. These common questions of law or fact include, but are not limited to, the following:

a) Whether Epic breached its E1000 aircraft customer reservation agreements with Plaintiffs and other Class members;

b) Whether Epic breached its implied duty of good faith and fair dealing to Plaintiffs and other Class members;

c) Whether Epic's representations regarding its plans and intent to manufacture and sell its E1000 aircraft once FAA certification was obtained were deceptive and misleading to Plaintiffs and other Class members;

d) Whether Epic's actions violate the Oregon Unlawful Trade Practices Act, O.R.S. §§ 646.605, *et seq.*;

e) Whether Epic's violations of the Oregon Unlawful Trade Practices Act were willful, reckless, and/or knowing;

f) Whether Plaintiff and Class members are entitled to damages under the Oregon Unlawful Trade Practices Act; and

g) Whether Plaintiff and Class members are entitled to declaratory or other equitable relief.

126. Epic engaged in a common course of conduct giving rise to the legal rights sought to be enforced by Plaintiffs, on behalf of themselves and the other members of the Class. Similar or identical statutory and common law violations, business practices, and injuries are involved. Individual questions, if any, pale by comparison, in both quality and quantity, to the numerous common questions that dominate this action.

127. **Typicality – Federal Rule of Civil Procedure 23(a)(3).** Plaintiffs' claims are typical of the claims of other Class members because, among other things, all such claims arise out of the same wrongful course of conduct engaged in by Epic in violation the laws as complained of herein. Further, the damages of each Class member were caused directly by Epic's wrongful conduct in violation of the laws as alleged herein.

128. **Adequacy of Representation – Federal Rule of Civil Procedure 23(a)(4).** Plaintiffs are adequate Class representatives because they are members of the Class and their interests do not conflict with the interests of other Class members they seek to represent. Plaintiffs have also retained counsel competent and experienced in complex commercial and class action litigation. Plaintiffs and

their counsel intend to prosecute this action vigorously for the benefit of all Class members. Accordingly, the interests of Class members will be fairly and adequately protected by Plaintiffs and their counsel.

129. **Declaratory and Injunctive Relief – Federal Rule of Civil Procedure 23(b)(2).** Epic has acted or refused to act on grounds generally applicable to Plaintiffs and other Class members, thereby making appropriate final injunctive relief and declaratory relief, as described below, with respect to the members of the Class as a whole.

130. **Superiority – Federal Rule of Civil Procedure 23(b)(3).** A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages or other financial detriment suffered by Plaintiffs and other Class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Epic, so it would be impracticable for Class members to individually seek redress for Epic's wrongful conduct. Even if Class members could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments, and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

## CLAIMS ALLEGED

## COUNT I
### Breach of Contract

131.   Plaintiff repeats and re-alleges each and every allegation above as if set forth herein.

132.   Plaintiffs and other Class members executed E1000 aircraft customer reservation agreements with Epic that governed the relationship between the parties. Specifically, the agreements provided Plaintiffs and Class members with the right to reserve and purchase an E1000 model aircraft once FAA certification and approval was obtained.

133.   Plaintiffs' and other Class members' E1000 aircraft customer reservation agreements are valid, enforceable contracts supported by consideration.

134.   In accordance with Epic's E1000 aircraft customer reservation contracts, Plaintiffs and other Class members executed the agreements as well as submitted the required paperwork and monetary deposits to Epic to secure an E1000 model aircraft production order position and to lock in a base price of $2.75 million.

135.   By executing an E1000 aircraft customer reservation agreement and submitting the required monetary deposit, Plaintiffs and Class members have satisfied all conditions precedent to the contract.

136.   Plaintiffs and other Class members are not in breach of the agreement and have fully performed their obligations under the agreement.

137. The Epic E1000 aircraft customer reservation agreement stated that: (i) "Epic is designing and developing a single-engine, turboprop aircraft called the E1000 pursuant to and in accordance with Federal Aviation Regulation (FAR) Part 23"; (ii) "Epic intends to obtain certification of the Aircraft for sale in the United States and to begin sales of the Aircraft in 2015 or 2016"; (iii) "the Customer has expressed an interest in purchasing the Aircraft once certificated and available to the general public"; (iv) "Epic requires a good faith deposit from Customer in the amount of Twenty Seven thousand five hundred (US) dollars, $27,500.00 . . . to be held on deposit to secure Customer's production order position of the Aircraft"; (v) "Epic represents that when and if the Aircraft is certified, Aircraft will be sold to customers in the order in which Epic receives fully executed Agreements"; and (vi) "Epic shall be entitled to terminate this Agreement and refund the Deposit only if Epic terminates its program to certify and/or produce the Aircraft or if the Parties do not enter into a final Purchase Agreement after the Aircraft is certified."

138. After several years of developmental efforts and reassuring customers of its intent to manufacture and sell the E1000 model aircraft, in late August 2020, less than a month after receiving an FAA production certificate for its E1000 aircraft, Epic, suddenly and without advance notice, sent a letter informing E1000 aircraft customer reservation holders that the E1000 aircraft was no longer available for sale.

139. In its August 2020 letter, Epic stated that it was introducing a new E1000 model aircraft, the E1000 GX, which had a retail base price of $3.85 million.

140. Epic's August 2020 letter also informed customers it was terminating all existing E1000 aircraft customer reservation agreements, but that customers had a "special, limited-time offer" to execute an E1000 GX aircraft customer reservation agreement.

141. Plaintiffs' and Class members' E1000 aircraft customer reservation agreements permit Epic to terminate the contract only if Epic terminated its program to certify or produce the E1000 model aircraft or if the parties did not enter into a purchase agreement after the aircraft was certified.

142. First, Epic did not terminate its program to certify the E1000 model aircraft.

143. In November 2019, the FAA granted Epic type certification for its E1000 model aircraft, and in July 2020, Epic received FAA production certification.

144. Second, Epic did not terminate its program to produce the E1000 model aircraft.

145. Just one month before telling E1000 aircraft customer reservation holders that it was no longer selling the E1000 model aircraft, Epic's Chief Executive Officer, Doug King, stated that "[t]he company has completed three aircraft customer deliveries so far this year, with plans to now further accelerate production schedules."

146. In late August 2020, at the time in which Epic told customer reservation holders that it was no longer selling the E1000 aircraft, Epic was actively manufacturing and assembling E1000 aircraft for sale.

147.    Additionally, as described herein, the E1000 model aircraft is nearly identical to the E1000 GX model. Epic's E1000 GX brochure shows that the only differences between the two airplanes are the autopilot system and the propeller.

148.    Epic's unilateral and sudden decision to make certain modifications to the E1000's autopilot system and propeller does mean that it terminated its program to produce the E1000 aircraft.

149.    Because the E1000 model aircraft is nearly identical to the E1000 GX model, Epic was not required to seek a new a production certificate from the FAA in order to manufacture and sell the E1000 GX.

150.    To date, Epic continues to utilize the FAA production certificate received in connection with its E1000 aircraft in order to manufacture the E1000 GX model aircraft.

151.    Third, Plaintiffs and other Class members are ready, willing and able to enter into purchase agreements for an E1000 aircraft at the contractually agreed-upon price provided in E1000 aircraft customer reservation agreements.

152.    Despite having numerous outstanding aircraft reservation contracts with customers for the right to reserve and purchase an Epic E1000 aircraft, Epic has wrongfully refused to manufacture and sell any E1000 aircraft to Plaintiffs and other members of the Class.

153.    By refusing to manufacture and sell E1000 aircraft to Plaintiffs and other Class members, Epic has breached its E1000 aircraft customer reservation agreements.

## COUNT II
### Breach of the Implied Covenant of Good Faith and Fair Dealing

154. Plaintiff repeats and re-alleges each and every allegation above as if set forth herein.

155. All E1000 aircraft customer reservation agreements entered into by Epic with Plaintiffs and other Class members include the implied duty of good faith and fair dealing.

156. The duty of good faith and fair dealing requires that parties to a contract not act in a way that destroys or injuries the rights of the other, or otherwise frustrates or defeats the object of the contract.

157. Epic breached its implied duty of good faith and fair dealing to Plaintiffs and Class members in the following ways, including but not limited to: (i) making contractual and repeated public misrepresentations regarding its intent to manufacture and sell its E1000 aircraft to persons who held E1000 aircraft reservation agreements; (ii) routinely misleading persons who held E1000 aircraft reservation agreements into reasonably believing that once FAA certification was obtained, Epic would immediately start manufacturing, selling and delivering E1000 aircraft to fulfill customer orders; (iii) publicly representing that in accordance with its contractual obligations and promises to E1000 aircraft customer reservation agreements, Epic had doubled its fabrication capacity, invested heavily in tooling and equipment as well as refined workflows all in an effort to accelerate E1000 production; and (iv) failing to disclose that Epic could unilaterally decide to change the E1000 aircraft in any manner at any time, which would purportedly

allow Epic to terminate E1000 aircraft customer reservation agreements.

158.   In reality, Epic did not intend to honor its E1000 aircraft customer reservation agreements. Epic slightly modified its E1000 aircraft so as to create a misleading and deceptive pretextual justification for terminating E1000 customer reservation contracts.

159.   As a result of Epic's breach of its contractual duty of good faith and fair dealing, Plaintiffs and Class members have incurred extracontractual damages in an amount to be determined at trial.

## COUNT III
### Violation of the Oregon Unlawful Trade Practices Act
### O.R.S. §§ 646.605, *et seq.*

160.   Plaintiff repeats and re-alleges each and every allegation above as if set forth herein.

161.   Plaintiffs bring this claim under the Oregon Unlawful Trade Practices Act (the "UTPA"), O.R.S. §§ 646.605, *et seq.*, on behalf of themselves and other Class members, who were subject to Epic's unlawful and deceptive conduct described herein.

162.   Plaintiffs and Epic are "persons" within the meaning of O.R.S. § 646.605(4).

163.   Epic is engaged in the sale of "goods" and "services" as defined in O.R.S. § 646.605(6)(a).

164.    Plaintiffs and Class members executed E1000 aircraft customer reservation agreements for right to reserve and purchase an E1000 aircraft for personal, family or household purposes.

165.    Epic is engaged in "trade" or "commerce" within the meaning of O.R.S. § 646.605(8), affecting consumers in Oregon and throughout the United States.

166.    Epic engaged in the design, development, testing, promoting, marketing, advertising and sale of its E1000 model aircraft.

167.    The Oregon UTPA prohibits the use of unfair or deceptive business practices in the conduct of trade or commerce. O.R.S. § 646.608(1).

168.    Epic violated O.R.S. § 646.608(1)(i) by advertising goods and services with intent not to provide them as advertised. Further, Epic violated O.R.S. § 646.608(1)(q) by promising to deliver goods and services within a certain period of time with intent not to deliver those goods and services as promised.

169.    The Oregon UTPA provides that a representation under § 646.608(1) may be any manifestation of any assertion by words or conduct, including, but not limited to, a failure to disclose a fact. O.R.S. § 646.608(2).

170.    From the time in which Epic first offered Plaintiffs and Class members the opportunity to enter into contractual agreements for the right to reserve and purchase an E1000 aircraft, Epic has repeatedly told its customers that once FAA certification was obtained, it would immediately start manufacturing, selling and delivering E1000 aircraft to customers who held Epic E1000 aircraft reservation agreements in accordance with a customer's order production position.

171.  Epic intended that Plaintiffs and each member of the Class would rely on its representations.

172.  Epic's conduct in making repeated misrepresentations regarding its intent to manufacture and sell its E1000 aircraft to persons who held E1000 aircraft reservation agreements constitutes the act, use and employment of deception, fraud, false pretenses, false promises, misrepresentation, and unfair practices in the conduct of Epic's trade or commerce.

173.  Epic also misrepresented to Plaintiffs and Class members that it purportedly terminated its program to produce the E1000 model aircraft. To this day, Epic continues to use the FAA production certificate received in connection with its E1000 model aircraft in order to manufacture and sell the E1000 GX aircraft.

174.  These misrepresentations are material because they concern the type of information upon which a reasonable consumer would be expected to rely upon in making a decision whether to execute an E1000 aircraft customer reservation agreement and to pay the required monetary deposit.

175.  Because Epic is in the business of manufacturing and selling aviation aircraft to the general public, Epic committed unfair and deceptive acts in the conduct of its trade and commerce.

176.  Epic's violations of O.R.S. § 646.608(1)(i) and (q) were willful as Epic knew that it did not intend to honor customer reservation agreements that provided the right to reserve and purchase an E1000 aircraft.

177.   Prior to August 2020, Epic never informed customers of its plan to modify the E1000 model aircraft or that any update to the aircraft would purportedly provide Epic with sole discretion to terminate E1000 aircraft customer reservation agreements.

178.   Epic purposely omitted these material facts when contracting with E1000 aircraft customers and when making public representations regarding its progress of obtaining FAA certification for its E1000 aircraft, to the detriment of Plaintiffs and other Class members.

179.   The unlawful conduct complained of herein was not an isolated incident or one-time mistake; rather, Epic's false advertising as well as material misrepresentations and omissions occurred over years as Epic repeatedly assured customers of its intent to manufacture and sell its E1000 aircraft to Class members who held customer reservation agreements.

180.   As a result of Epic's willful, knowing and reckless violations of O.R.S. §646.608(1)(i) and (q), as described herein, Plaintiffs and Class members suffered an ascertainable loss of money or property.

181.   Plaintiffs and the Class lost money due to the difference between the value of the contractually agreed-upon price of $2.75 million for an E1000 aircraft and Epic's most recent retail price of $3.25 million.

182.   Epic's violations of the Oregon UTPA as alleged herein were willful and reckless, in pursuit of profit, and constitute wanton, outrageous and oppressive violations of the right of consumers to be from unlawful trade practices.

Consequently, pursuant to O.R.S. § 646.638, Plaintiffs and the Class are entitled to recover actual and punitive damages.

183.    Plaintiffs and the Class also seek to enjoin Epic's ongoing deceptive practices and efforts to terminate existing E1000 aircraft customer reservation agreements.

## JURY DEMAND AND NOTICE TO ATTORNEY GENERAL

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury of all claims in this Class Action Complaint so triable. Further, pursuant to O.R.S. § 646.638(2), upon filing this action, this Class Action Complaint shall be mailed to the Attorney General of the State of Oregon along with proof of receipt.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of the other members of the Class proposed in this Class Action Complaint, respectfully request that the Court enter judgment as follows:

A.    Declaring that this action is a proper class action, certifying the Class as requested herein, designating Plaintiffs as Class Representatives, and appointing the undersigned counsel as Class Counsel for the Class;

B.    Enjoining Defendant from engaging in the unlawful conduct set forth herein and from terminating existing E1000 aircraft customer reservation agreements;

C.    Ordering Defendant to pay actual damages to Plaintiffs and the other members of the Class;

D.    Ordering Defendant to pay punitive damages, as allowable by law, to Plaintiffs and the other members of the Class;

E.    Ordering Defendant to pay attorneys' fees and litigation costs to Plaintiffs and the other members of the Class;

F.      Ordering Defendant to pay both pre- and post-judgment interest on any amounts awarded;

G.      Leave to amend this Complaint to conform to the evidence presented at trial; and

H.      Ordering such other and further relief as may be just and proper.


Dated: August 13, 2021          Respectfully submitted,

By: */s/ Alan J. Leiman*

Alan J. Leiman
alan@leimanlaw.com
LEIMAN LAW, PC
P.O. Box 5383
Eugene, Oregon 97405
Telephone: 541.345.2376

Michael J. Malatesta (to apply *Pro Hac Vice*)
mike@malatestalaw.com
MALATESTA LAW OFFICES, LLC
5310 N. Harlem Avenue, Suite 203
Chicago, Illinois 60656
Telephone: 312.445.5041

***Counsel for Plaintiffs and the Class***